**Marcelino GONZALEZ, Petitioner,**

**v.**

**Charles SCULLY, Defendant.**

**No. 82 Civ. 5125 (MJL).**

United States District Court,
S.D. New York.

Jan. 9, 1984.

Marcelino Gonzalez, pro se.

The Legal Aid Society, Federal Defender Services Unit by Barry Bassis, New York City, for petitioner.

Robert Abrams, Atty. Gen., State of N.Y., by Fredrick S. Cohen, Asst. Atty. Gen., New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

LOWE, District Judge.

### INTRODUCTION

Before us is a petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2254. Petitioner is currently incarcerated in the Green Haven Correctional Facility in Stormville, New York, pursuant to a judgment of conviction rendered November 1, 1978, on a charge of attempted sodomy in the first degree (N.Y.P.L. §§ 110, 130.50). Petitioner was sentenced as a second felony offender to an indeterminate term of imprisonment of seven and a half to fifteen years. His conviction was unanimously affirmed without opinion by the Appellate Division, First Department on April 6, 1982. On May 26, 1982, petitioner's application for leave to appeal to the New York State Court of Appeals was denied.

In the instant petition, petitioner challenges his conviction on two grounds. First, he claims that the admission at trial of the complaining witness' preliminary hearing testimony violated his rights under the Confrontation Clause of the Sixth Amendment. Second, he claims that not every element of the crime of which he was convicted was proven beyond a reasonable doubt. In a Memorandum Opinion and Order dated February 8, 1983, this Court found that petitioner had exhausted his available state remedies and directed the State to respond to the merits of petitioner's claims. The Court also appointed the Legal Aid Society, Federal Defender Services Unit, as counsel to petitioner in these proceedings.

### FACTS

*Pre-Trial Proceedings*

Petitioner Marcelino Gonzalez, was charged in a Bronx County indictment (2394/76) with attempted sodomy in the first degree (N.Y.P.L. §§ 110/130.50) for allegedly attempting to engage in deviate sexual intercourse with one Lydia Mendez. He was also charged with attempted sexual abuse in the first degree (N.Y.P.L. §§ 110/130.65) and endangering the welfare of a child (N.Y.P.L. § 260.10). On October 18, 1976, a preliminary hearing was held, at which the complaining witness testified that petitioner had attempted to forcibly sodomize her. On January 5, 1978, petitioner entered a plea of guilty before the Honorable William Drohan, to attempted sexual abuse in the first degree. Petitioner subsequently sought to vacate his guilty plea on the ground that his attorney had coerced him into accepting the plea agreement. On February 21, 1978, the

court granted petitioner's motion although it specifically rejected the claim that his former counsel had improperly pressured him into accepting the plea (Transcript of February 21, 1978 hearing at 3).

On June 9, 1978, the date scheduled for jury selection, the prosecutor made an oral motion to introduce the preliminary hearing testimony of the complaining witness pursuant to N.Y.C.P.L. §§ 670.10 and 670.20. At a hearing to determine whether the preliminary hearing testimony should be admitted, the following evidence was elicited.

Detective Jack Jasko of the Bronx County District Attorney's office testified that on June 6, 1978, he was asked by Assistant District Attorney William Flack to locate the complainant Lydia Mendez (T. 12–14). Detective Jasko, who had over twenty years experience in attempting to locate missing witnesses, immediately went to the complainant's last known address at 1487 Vyse Avenue in the Bronx, but was unable to gain entry to the building or speak to any of the tenants. During the next few days, the detective returned to the Vyse Avenue address several times, but without success (T. 13, 14). He also visited the elementary school which Lydia had supposedly attended in 1976, at the time the alleged crime was committed, but he was informed by the attendance clerk that there was "absolutely no record of Lydia Mendez having attended that school" (T. 14). Moreover, none of the school teachers who were interviewed could remember Lydia (T. 14). Detective Jasko then checked the City Scanner, which locates missing persons, the City Welfare Bureau and the Post Office, but was unable to obtain any additional information about Lydia's or her mother's whereabouts (T. 14, 15, 207).

On June 9, the detective returned to the Vyse Avenue address after learning that Pedro Cepeda was the owner of the building (T. 15). There he met with Ruth Cepeda, the thirteen year old daughter of the owner. Though Ruth would have been in the same grade and school as the complainant, she claimed never even to have heard of her (T. 15–16). Ruth did give Detective Jasko telephone numbers at which her parents could be reached, but she explained that her parents only spoke Spanish (T. 16).

Detective Jasko then asked Assistant District Attorney David Maldonado, who is fluent in Spanish, to contact Grace Cepeda, the girl's mother. Maldonado testified that he spoke with Mrs. Cepeda on the telephone, and learned that the Mendez family had moved to Texas in 1976 (T. 16–17, 47). Mrs. Cepeda recalled that one of the Mendez children had written to her daughter and stated that she would look for the envelope when she returned home from work. Two days later, Mrs. Cepeda provided Detective Jasko and Assistant District Attorney Maldonado with a used envelope which was addressed to Ruth Cepeda and bore a return address of Doris Prieto, 403 West 4th, Del Rio, Texas 78840 (T. 18, 19).[1]

After obtaining this information, Detective Jasko attempted to contact Doris Prieto by telephone. He spoke to the supervisor in charge of the information section of the telephone company in San Antonio, Texas, and was informed that there was no telephone listing for either a Doris Prieto or a Domitilias Mendez (T. 19). However, Detective Jasko was given the numbers of three "Prietos." He spoke with people at each of these numbers but was unable to obtain any leads (T. 20). He then checked with a postal superintendent in New York, but learned that the Mendez family had left no forwarding mailing address (T. 20). Afterwards, he again unsuccessfully used the City Scanner in an attempt to locate Lydia Mendez and her mother (T. 20).

At the hearing before the state court, Detective Jasko agreed that there were additional steps he could take to attempt to locate Lydia Mendez. Therefore, on June 13, the day after the hearing, Detective Jasko again contacted Ruth Cepeda. In response to Detective Jasko's questioning, Mrs. Cepeda indicated that she did not know of any other friends or relatives of

---

1. Ruth Cepeda believed Doris Prieto to be the oldest child of Domitilias Mendez.

the Mendez family, or anyone else who might have information as to the family's whereabouts (T. 63–65). Detective Jasko also contacted the Del Rio Police Department and had a police car sent to Mendez' last known address (T. 76). However, the Mendez family was not present at that location and was not known in the community. Detective Jasko then contacted the three Roman Catholic churches in the city and asked them to check their records. This too proved unsuccessful (T. 70). Lastly, the detective went to the Bureau of Vital Statistics at 125 Worth Street, but was unable to find a certificate of birth for the complainant.

In addition to the testimony of Detective Jasko and Assistant District Attorney Maldonado, Barbara Harper, the court reporter who took notes of the preliminary hearing testified as to the accuracy of the transcript (T. 55–57).

The defense called as a witness Assistant District Attorney William Flack, who had been assigned on February 15, 1977, to prosecute petitioner (T. 89–90). Flack testified that he first learned that Lydia Mendez might be unavailable to testify in January or February 1978 (T. 92). At that time, he believed her to be in Texas (T. 93). The only effort he made to locate the witness between January and June 1978 was to mail a subpoena, which was never returned (T. 91–92, 93, 95).

During that period, Flack advised his superiors that the witness could not be found, but nobody instructed Flack to send out an investigator (T. 94). It was not until June 6, 1978, about a week before petitioner's trial was scheduled to commence, that Flack asked Detective Jasko, to attempt to locate Lydia Mendez (T. 94, 97). In oral argument, the prosecutor contended that his investigators usually found missing witnesses in one or two days (T. 98).

In an oral opinion, Justice Drohan upheld the introduction of the preliminary hearing testimony (T. 114–122). He found that "the [Mendez] family has obviously removed itself outside the state. There is nothing to suggest to any of us here that these people will return here at any future time, no less any time in the immediate future (T. 119–120)." After examining the efforts made by the prosecution to locate Miss Mendez, the court concluded that it "[was] satisfied that the due diligence requirement of Section 670.10 and 670.20 ha[d] been satisfied" (T. 120). In reaching this conclusion the court noted that "[t]he District Attorney is not expected under our system of criminal justice to continue his complainant in a lockup or to limit a 13 year old's liberty so that he may bring her to court" (T. 119).

The Court then addressed the question of whether the defendant had had an adequate opportunity to confront the complaining witness at the preliminary hearing. As stated by the court:

> With respect to the examination and cross examination of the complainant, the Court has previously alluded to the length of time as reflected by the typewritten record that the examination and cross-examination used. Obviously the defendant and his lawyer were there to confront the witness and examine her at a time when reactions of all were sharper than they might be at this date. The complainant was then 11 years of age and was sworn by the Magistrate after a preliminary inquiry as to whether or not she understood the meaning of the oath. The cross examination took the complaining witness through all of the events which she had testified to on direct testimony. There was an effort made by the defense counsel to review and re-review her statements made for what appears to be the obvious purpose of eliciting from her alterations in her testimony. Quite obviously there are limitations apparent in this cross examination but this Court is reluctant to ascribe a reason for them. It is not unusual for a defense counsel in a child molesting or sexual abuse case involving a girl or boy of tender years to very warily and carefully and at times very circumspectively cross examine the complainant. Time and again experienced trial counsel have avoided the ex-

aminations of complaining witnesses of tender years and so it is not unusual that the cross examination at the hearing was no more than fifteen or sixteen pages referred to.

However, the court is satisfied that there was an effort made to shake the witness' testimony, that there was a confrontation and unless Sections 670.10 and 670.20 of the Penal Law—of the Criminal Procedure Law do not mean what they say, then this testimony serves no purpose at this juncture.

In *Berger v. California*, 393 U.S. 314 [89 S.Ct. 540, 21 L.Ed.2d 508], Supreme Court of the United States indicated that testimony at a preliminary hearing may indeed be used. The Court is satisfied that there is no constitutional prohibition [T. 120–121].

Based on its findings that the District Attorney had exercised due diligence in attempting to find the complainant, and that there had been an adequate confrontation of the witness by the defense at the Preliminary Hearing, the court ruled, over the objection of the defense, that the prior testimony could be admitted at trial (T. 122).

Defendant's motion to suppress statements made by the defendant to the arresting officers, and the clothing seized after his arrest was denied after a hearing. The propriety of these findings is not an issue raised in the instant petition.

*The Trial*

At petitioner's trial, the preliminary hearing testimony of Lydia Mendez was read to the jurors by the district attorney. On direct examination, Lydia gave the following account of the events in question.

On September 26, 1976, at about 5:40 p.m., she was returning from an errand at the fish store when petitioner drove up "right in front of [her]" (T. 201). He threatened Lydia that if she did not get in the car he would burn her mother's apartment down. Lydia got into the car because she was afraid. Once Lydia was in the car, petitioner asked her if she had ever done "fresh things before" (T. 202). Lydia re-

sponded "no". Petitioner parked the car in a deserted area and pulled down Lydia's pants. Lydia struggled to pull her pants up from the top. Petitioner took his penis out of his pants and attempted to sodomize Lydia from behind. He told Lydia to turn around but she refused (T. 202–204). Petitioner's penis never touched Lydia's body because she was trying to get away when the police arrived (T. 204).

The two officers who arrived at the scene, testified that they had seen petitioner's car parked in an open wooded area (T. 247). As the officers passed the vehicle and looked in, they notice a "mild struggle" involving a "very young person" (T. 249). It looked as if petitioner was "trying to hug" the girl, but she was pushing him away (T. 331–332). As the patrol car parked about 20 feet parallel to the parked car, the officers saw petitioner leave the vehicle "zippering up his pants" as he walked back toward the trunk (T. 250). The car door was left open and the officer saw Lydia Mendez naked from the waist down, with her blouse pulled up above her chest (T. 251).

Officer Ferris approached petitioner while Officer Marzette went over to Miss Mendez. When Officer Ferris inquired as to what was going on, petitioner responded that he was teaching his daughter how to drive (T. 251). Lydia, crying hysterically, told Officer Marzette that petitioner was her father (T. 322). However, after the police officer had Lydia arrange her clothes and step out of the car, and again asked her what had happened, Lydia said, "He was trying to screw me in my behind. He told me to say that [he was the girl's father]" (T. 322). Shortly thereafter, Officer Ferris looked into petitioner's car, and saw wet stains which appeared to be semen on the front seat (T. 253). On the rear seat was a bag of fish (T. 254, 323). The officers then compared notes of their respective conversations and placed petitioner under arrest (T. 252, 323).

At the station house, petitioner's trousers which appeared stained and his under-

wear, were vouchered and sent to the police laboratory for examination. Police Officer Edward Masin, a serologist examined petitioner's clothing. The examination showed that semen was present on petitioner's underwear, but the chemist admitted that semen could have been present for a year or more if the fabric was not washed (T. 299, 304). A test on the trousers proved negative.

Jack Jasko and David Maldonado testified as to their attempts to locate Lydia Mendez. Officer Marzette testified that he had driven Lydia and her mother to the grand jury in November, 1976. Mrs. Mendez told the patrolman that she might be moving to Texas. He so informed "[e]ither Mr. Flack or someone in the District Attorney's office" (T. 354). Marzette asked Mrs. Mendez to get in touch with him before she moved so that she could leave her address, but Mrs. Mendez never called.

At the close of the prosecutor's case, the defense moved to dismiss all counts for insufficiency. The motion was denied.

*Petitioner's Sixth Amendment Claim*

Petitioner first claims that his Sixth Amendment right of confrontation was violated by the admission of the complaining witness' preliminary hearing testimony at petitioner's trial.

The Sixth Amendment's Confrontation Clause, made applicable to the states through the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403–405, 85 S.Ct. 1065, 1067–1068, 13 L.Ed.2d 923 (1965), guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."

■ Although the Confrontation Clause has not been construed literally to require the exclusion of all statements of persons who do not appear at trial, a two-tier test must be satisfied before the introduction of such statements will be deemed constitutional. First, the state must show that the witness is unavailable and second, the state must demonstrate that the statements sought to be introduced bear adequate "in-

dicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 63–65, 100 S.Ct. 2531, 2537–2538, 65 L.Ed.2d 597 (1980). Petitioner contends that the respondent here has failed to satisfy either requirement.

■ We first address the issue of unavailability. Before a missing witness can be found to be "unavailable" in the constitutional sense, the prosecution must demonstrate that it made a "good-faith effort" to obtain her presence at trial. *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980). The Court must be satisfied that "the prosecutor's failure to produce [the witness] was not due to indifference or a strategic preference for presenting her testimony in the more sheltered form of hearing minutes rather than in the confrontational setting of a personal appearance on the stand." *People v. Arroyo*, 54 N.Y.2d 567, 446 N.Y. S.2d 910, 913, 431 N.E.2d 271, 274 (1982), *cert. den.*, 456 U.S. 979, 102 S.Ct. 2248, 72 L.Ed.2d 855.

■ Although what constitutes a "good-faith effort" must necessarily be determined on a case-by-case basis, Supreme Court precedent provides us with certain guiding principles. As stated by the Court in *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980):

> The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death) "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation. "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." *California v. Green*, 399 U.S. [149] at 189 n. 22 [90 S.Ct. 1930, 1951 n. 22, 26 L.Ed.2d 489] (concurring opinion, citing *Barber v. Page* [390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255], *supra*). The ultimate question is whether the witness is unavailable despite good-faith efforts un-

dertaken prior to trial to locate and present that witness.

In *Roberts* the Court concluded that "good faith" did not require the prosecution to search out of state for a missing witness where the prosecution had "no clear indication, if any at all" of the witness' whereabouts." *Id.* at 76, 100 S.Ct. at 2544.[2] According to the Court, "the great improbability that [additional] efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." *Id.* at 75–76, 100 S.Ct. at 2544.[3]

The Court distinguished *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), the only case in which the Court has found an absence of good-faith effort. There the prosecution knew that the witness was incarcerated in a federal penitentiary in a neighboring state but made no attempt whatsoever to secure his presence at trial.

In the present case, petitioner does not seriously challenge the scope of the prosecution's search for Lydia. Although the prosecution had no "clear indication" of Lydia's whereabouts, it made an affirmative effort to develop leads and follow up on them. Detective Jasko explored all likely sources of information in New York, mostly without success. He did, however, obtain a Texas address which he believed to be the address of Lydia's older sister. He then attempted to locate the Mendez family in Texas first by telephone, then through the Del Rio, police department, and lastly through the Catholic churches in the community. Again all of his sources of information were exhausted without success.[4] The record does not indicate, and the petitioner does not argue, that there were any further steps which the detective could have taken which would have been reasonably likely to produce information about Lydia's whereabouts.

Petitioner's main argument goes to the timing of the prosecution's actions; he argues that the state was negligent in waiting until the "eve of trial" to begin the search. Petitioner relies on Prosecutor Flack's own testimony that he became aware that Lydia had moved approximately five months prior to petitioner's trial, yet made no real effort to locate her until he sent Detective Jasko out on June 6, 1978.[5]

---

**2.** The record in *Roberts* showed that approximately four months before the defendant's trial, and some ten months after the preliminary hearing testimony was given, the prosecution contacted Mrs. Isaacs the witness' mother, about her daughter Anita's whereabouts. Mrs. Isaacs gave the prosecution the following information: Anita ... left home [Ohio] for Tucson, Ariz., soon after the preliminary hearing. About a year before the trial, a San Francisco social worker was in communication with the Isaacs about a welfare application Anita had filed there. Through the social worker, the Isaacs reached their daughter once by telephone. Since then, however, Anita had called her parents only one other time and had not been in touch with her two sisters. When Anita called, some seven or eight months before trial, she told her parents that she "was traveling" outside Ohio, but did not reveal the place from which she called. Mrs. Isaacs stated that she knew of no way to reach Anita in case of an emergency. App. 9. Nor did she "know of anybody who knows where she is." *Id.,* at 11.
Prior to learning that Anita had left the state, the prosecution had sent two subpoenas to her parents home; after learning of her departure, he sent three more subpoenas to the same address. The prosecution took no other steps to find Anita such as contacting the San Francisco social worker with whom Mrs. Isaacs had spoken.

**3.** *See also Glenn v. Dallman*, 635 F.2d 1183 (6th Cir.1980), *cert. denied*, 454 U.S. 843, 102 S.Ct. 155, 70 L.Ed.2d 128, where the Sixth Circuit, relying on the language in *Roberts*, held that it was not unreasonable for the prosecution to cease its efforts to locate a witness, once a detective learned that the witness had gone to an undetermined destination in California.

**4.** The fact that some of the detectives' efforts were made only after defense counsel suggested them on the first day of the due diligence hearing, does not negate the fact that these efforts were made.

**5.** It must be pointed out that although Mr. Flack learned of Lydia's unavailability in January, 1978, the Court did not grant petitioner's motion to withdraw his guilty plea until February 21, 1978. Thus Mr. Flack did not know that Lydia's testimony would be necessary until late Febru-

Petitioner suggests that had the prosecution acted earlier, it could have located Lydia through her sister, Doris Prieto, in Del Rio.

■ The Court cannot agree that the prosecution's delay in searching for Lydia demonstrates an absence of good faith. Although it is easy with the benefit of hindsight to argue that the prosecution might have been more likely to find Lydia if it had acted earlier, this is not something which the prosecution should reasonably have known at the time it learned Lydia was unavailable. Prosecutor Flack testified that it ordinarily took only several days to locate a missing witness; in fact, although the detective in this case never located Lydia, he had exhausted all of his leads in less than a week. Even if the prosecution had had more time prior to petitioner's trial, we believe on the facts of this case, that it was very unlikely that any additional efforts would have resulted in locating the witness.

Furthermore, although Mr. Flack had some idea that Lydia had moved to Texas, he had no way of knowing that she would move again, within a matter of a few months and without a trace. Finally, even if Mr. Flack had located Lydia in Texas several months before petitioner's trial, there is no assurance that Lydia or her mother would have contacted him before the family moved again. Indeed this seems rather unlikely, given the fact that the family had failed to communicate with Mr. Flack prior to its move to Texas. Thus, we cannot say that the prosecution's "good-faith effort" was defeated by its failure to search for Lydia until the week of petitioner's trial.

■ A separate but related question is whether the prosecution should have taken steps to prevent Lydia from becoming unavailable in the first place. More specifical-ly, was the prosecution unreasonable in failing to maintain contact with the Mendez family after the preliminary hearing and prior to the move? Although it is no doubt wise policy for the prosecution to communicate regularly with its witnesses and counsel them on the importance of their being available for trial, we do not believe that such efforts are constitutionally mandated. In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the prosecution did not communicate with the witness for ten months after the preliminary hearing. By the time the prosecution contacted the witness' mother, the witness had left the state. Nevertheless, the Court upheld the prosecution's actions as reasonable. There was no intimation by the Court that the prosecution had any affirmative obligation to prevent the witness from becoming unavailable.

■ Petitioner suggests that the prosecution may have had prior notice that the Mendez family was moving to Texas. This allegation, if proven, would certainly be relevant to our good-faith determination. We would seriously question the motives of a prosecutor who knowingly allowed a complaining witness to move out of state without so much as obtaining a forwarding address. However, we find no substantial evidence on the record before us that the prosecutor did so in the present case. At the due diligence hearing before the state court, there was no suggestion that the prosecution had advance notice of Lydia's move. To the contrary, Mr. Flack testified that he did not learn that Lydia would be unavailable to testify until after petitioner pled guilty in January of 1978. In fact both Mr. Flack and Mr. Bennett, petitioner's attorney at that time, believed the witness to "be around" during the plea negotiations (T. 96).[6] Petitioner's argument at

---

ary, 1978, only three and a half months prior to petitioner's trial.

**6.** As stated by Flack:

I point out to the Court that up until January of 1978 People had no knowledge, in fact, that the complaining witness, Lydia Mendez, was unavailable for trial; that I believe, although I am not sure, the defendant pled guilty in this case and Court can take note of that fact on the Court papers that defendant had pled guilty and during those plea negotiations I believe those plea negotiations were in January of '78, that Mr. Bennett, the then

trial as well as his argument on direct appeal, was based solely on the undisputed fact that Mr. Flack had known Lydia to be unavailable since January of 1978.

The claim that Mr. Flack had prior knowledge that Lydia was going to move, was not raised until the instant proceeding. It is based solely on testimony of Officer Marzette which was given at petitioner's trial. Officer Marzette testified that when he drove Lydia and her mother to the grand jury proceeding, Mrs. Mendez informed him that the family might be moving to Texas. He further testified that he had told Mr. Flack or someone in the District Attorney's office of the move. This testimony slipped by largely unnoticed. The Officer was never examined further, either on direct or cross, as to when he so informed the district attorneys' office (before or after Lydia became unavailable?), who he spoke with, or what specifically he said. The trial judge was never asked to reconsider his ruling on the preliminary hearing testimony in light of this new information. And as mentioned before, this issue was never raised on direct appeal.

▌ In short, we do not believe that Officer Marzette's rather vague testimony, which came well after the due diligence hearing was concluded, and which was apparently deemed insignificant even by defense counsel, raises a serious question as to the prosecution's good faith. Accordingly, for the reasons stated above, we conclude that Lydia Mendez was unavailable for purposes of the exception to the Sixth Amendment right of confrontation.

We now turn to the issue of the reliability of the preliminary hearing testimony which was admitted at petitioner's trial. Petitioner argues that Lydia's testimony was "intrinsically unbelievable [7] and was never tested at the prior proceeding by adequate cross-examination." Supplemental Memorandum, at 19. He emphasizes that because of the nature of the crime and the age of the victim, the need for a vigorous cross-examination was particularly acute. Yet the defense counsel's cross-examination of Lydia at the preliminary hearing was, in petitioner's view, both brief and ineffective. The questioning, which filled about fifteen pages of transcript, served mainly to repeat and reinforce the examination by the prosecutor. Even the trial judge noted that "[q]uite obviously there [were] limitations apparent in this cross examination", but he was "reluctant to ascribe a reason for them." [8]

Petitioner partially attributes the inadequacy of the cross-examination at the preliminary hearing to the fact that defense counsel did not have the advantage of certain impeachment materials at that time. For example, the lawyer was apparently

---

attorney for Gonzalez, had approached me and said to the best of my knowledge did I know if the complainant was around, which I answered I did, and based on that fact a plea was taken; that, in fact when Mr. Bennett himself · said he had seen the complaining witness around recently, the mother of the complaining witness, not the complaining witness herself. And, based on that fact he decided, as defendant decided to plead guilty. And somewhere after that defendant attempted to withdraw his plea of guilty and that, in fact the People, after hearing and prior to the decision of the Court, I believe the People said they would also consent to withdrawal of a plea based on the fact that we had felt that we could, in fact, locate the complaining witness. [T. 96, 97]

Based on this testimony, the trial judge found that prior to entry of petitioner's guilty plea in January, 1978, the district attorney had been advised that the complainant was in the New York area and would be available to him (T. 118).

7. In particular, petitioner argues that the facts as testified to by Lydia raise substantial questions as to whether petitioner used force. For example, when petitioner first approached Lydia she was very close to her home. She could have run away from petitioner, who is missing his left leg. Yet she got into the car allegedly because petitioner threatened to burn her house down. Petitioner suggests that such a threat would have had little force, if as Lydia testified, petitioner was a total stranger who most likely would not know where she lived.

8. The trial judge noted that "[i]t is not unusual for a defense counsel in a child molesting or sexual abuse case involving a girl or boy of tender years to very warily and carefully and at times very circumspectively cross examine the complainant." (T. 120–121)

unaware that contrary to Lydia's testimony at the hearing, both Lydia and her mother told the arresting officers at the station house that they knew petitioner. Thus, he was unable to examine Lydia as to her possible bias and motive to falsify. In addition, petitioner claims that there were certain inconsistencies between Lydia's testimony and the police and forensic reports, which were not known at the time of the preliminary hearing.

We believe that petitioner's argument reflects a fundamental misunderstanding of the Court's role in reviewing the reliability of preliminary hearing testimony. Petitioner asks the Court to consider the age of the complainant, the nature of the crime and the contents of the witness's testimony. However, the Supreme Court in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), made it clear that a Court need not "undertake a particularized search for 'indicia of reliability'" in cases of this kind. *Id.* at 72, 100 S.Ct. at 2542. The Court noted that in *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), it "found guarantees of trustworthiness in the accouterments of the preliminary hearing itself; there was no mention of the inherent reliability or unreliability of [the witness] and his story."

*Roberts*, 488 U.S. at 73, 100 S.Ct. at 2542.[9] As it had in *Green*, the Court concluded:

"Since there was an adequate opportunity to cross-examine [the witness], and counsel ... availed himself of that opportunity, the transcript ... bore sufficient 'indicia of reliability' and afforded ' "the trier of fact a satisfactory basis for evaluating the truth of the prior statement." ' " [citation omitted]

*Roberts*, 448 U.S. at 73, 100 S.Ct. at 2542.

■ In light of *Roberts* and *Green*, we conclude that the reliability of preliminary hearing testimony is not dependent on the intrinsic believability of the witness or her statements. Preliminary hearing testimony is *per se* reliable as long as the witness testifying was subject to cross examination.

■ In the present case petitioner does not and cannot dispute the fact that defense counsel cross-examined Lydia Mendez at the preliminary hearing.[10] However, he argues that the cross-examination was not adequate to assist the jury in assessing Lydia's credibility. Although we acknowledge that defense counsel's cross-examination of Lydia was less than vigorous, we decline as did the Court in *Roberts* to consider "whether defense counsel's questioning at the preliminary hearing sur-

9. The defendant in *Roberts* had argued that the missing witness' preliminary hearing testimony was unreliable because the witness had a strong motive to lie, and because her disappearance prior to trial suggested an effort to avoid punishment, perjury or self-incrimination.

10. Defense counsel's questioning of Lydia, which was "replete with leading questions", "clearly partook of cross-examination as a matter of *form*." *Ohio v. Roberts*, 448 U.S. at 70, 100 S.Ct. at 2541. In addition we agree with the trial judge that the questions seemed calculated to elicit alterations in the witness's testimony (T. 120). Thus counsel's questioning "comported with the principal *purpose* of cross-examination: to challenge 'whether the declarant was sincerely telling what he believed to be the truth, whether the declarant accurately perceived and remembered the matter he related, and whether the declarant's intended meaning is adequately conveyed by the language he employed.' [citation omitted]" *Ohio v. Roberts*, 448 U.S. at 71, 100 S.Ct. at 2541.

Since defense counsel did in fact cross-examine the complainant at the preliminary hearing, we need not address the question left open by the Supreme Court in *Roberts*, whether the mere opportunity to cross-examine absent actual cross-examination satisfies the confrontation clause. However, we note that courts considering this question have generally concluded that the opportunity for cross-examination is sufficient. *See e.g., People v. Arroyo*, 54 N.Y.2d 567, 446 N.Y.S.2d 910, 915, 431 N.E.2d 271, 276 (1982), *cert. den.*, 456 U.S. 979, 102 S.Ct. 2248, 72 L.Ed.2d 855; *United States v. Zurosky*, 614 F.2d 779, 793 (1st Cir.1979), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980); *Phillips v. Wyrick*, 558 F.2d 489, 496 (8th Cir. 1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1283, 55 L.Ed.2d 793 (1978); *United States v. Amaya*, 533 F.2d 188 (5th Cir.1976), *cert denied*, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977); *Havey v. Kropp*, 458 F.2d 1054, 1057 (6th Cir.1972).

mounts some inevitably nebulous threshold of 'effectiveness.'" *Roberts*, 448 U.S. at 73, n. 12, 100 S.Ct. at 2543, n. 12.[11] We agree with the Eighth Circuit that the manner in which counsel conducts a cross-examination is "a matter of defense strategy, and deliberate trial tactics do not ordinarily exact constitutional protection." *Phillips v. Wyrick*, 558 F.2d 489, 496 (8th Cir.1977), *cert. den.* 434 U.S. 1088, 98 S.Ct. 1283, 55 L.Ed.2d 793 (1978).

Petitioner claims that his right to cross-examine the complainant at the preliminary hearing was frustrated by the fact that his attorney did not have access to important impeachment material, such as facts concerning the relationship between petitioner and the victim or her mother, and inconsistent statements by Lydia. However, to the extent that the petitioner had had prior contact with the victim or her mother which might have given rise to possible bias against him, these facts had to have been known to petitioner at the time of the preliminary hearing. Defense counsel undoubtedly had access to the petitioner, at least at the point of the preliminary hearing when Lydia testified that she had never seen the petitioner before the day of the incident. *See People v. Arroyo*, 54 N.Y.2d 567, 446 N.Y.S.2d 910, 915, 431 N.E.2d 271, 277 (1982) *cert. den.*, 456 U.S. 979, 102 S.Ct. 2248, 72 L.Ed.2d 855.[12] With respect to the police and forensic reports allegedly containing inconsistent statements by the complainant, there is no apparent reason why these records could not have been subpoenaed and put into evidence at trial.

*See Id.* 446 N.Y.S.2d at 916, 431 N.E.2d at 278. Therefore, we do not believe that petitioner was prejudiced because he lacked material information at the time of the preliminary hearing.[13]

In sum, we find no circumstances in the present case which would warrant departure from the general rule that preliminary testimony is *per se* reliable where defense counsel had a fair opportunity to examine the witness, and did in fact avail himself of that opportunity. Having already decided that Lydia was "unavailable" in the constitutional sense, we conclude that petitioner's Sixth Amendment rights were not violated by the admission at trial of Lydia's preliminary hearing testimony.

## Sufficiency of the Evidence

Petitioner also contends that the state failed to prove every element of attempted sodomy in the first degree beyond a reasonable doubt. We need not linger long on this claim for we find that the evidence against petitioner was overwhelming.

■ We note from the outset that Lydia's testimony is not to be accorded less weight because it was given at a preliminary hearing rather than at trial. Having passed the test of unavailability and reliability, Lydia's preliminary hearing testimony "became part of the record of the trial on a footing subject only to its ultimate persuasiveness with the triers of fact, equal to that accorded testimony given directly at trial for the first time." *People v. Arroyo*, 54 N.Y.2d 567, 446 N.Y.S.2d 910,

---

**11.** The *Roberts* Court held that "in all but such extraordinary cases, [referring to *Mancusi v. Stubbs*, 408 U.S. 204, 216, 92 S.Ct. 2308, 2314, 33 L.Ed.2d 293 (1972) wherein the fact that defense counsel at the preliminary hearing had already been found to be ineffective prompted the Court to explore the character of the cross-examination] no inquiry into 'effectiveness' is required. A holding that every case involving prior testimony requires such an inquiry would frustrate the principle objective of generally validating the prior-testimony exception in the first place—increasing certainty and consistency in the application of the Confrontation Clause." *Roberts v. Ohio*, 448 U.S. at 73, n. 12, 100 S.Ct. at 2543 n. 12.

**12.** We also note that Officers Ferris and Marzette testified at trial that Lydia and her mother told police that they knew the petitioner from the neighborhood, and this fact was mentioned in defense counsel's summation (T. 379).

**13.** Cf. *People v. Reed*, 98 Misc.2d 488, 414 N.Y.S.2d 89 (Sup.Ct.Crim. Term 1979), where the court found that because defense counsel was not aware of chronic alcoholism of the witness at the time of the preliminary hearing, effective cross-examination of the witness was not possible. Therefore the court held that the preliminary hearing testimony was not sufficiently reliable to be admitted at trial.

431 N.E.2d 271 (1982), *cert. den.*, 456 U.S. 979, 102 S.Ct. 2248, 72 L.Ed.2d 855.

 Furthermore, in addition to Lydia's testimony, there was strong corroborating testimony by the two police officers who arrived at the scene of the crime. The officers observed: a "mild struggle" between petitioner and the complainant in the car; petitioner zippering up his pants and tucking in his shirt as he left the car; Lydia naked from the waist down and with her shirt pulled up inside the car; and Lydia crying hysterically. In addition, petitioner falsely told Officer Marzette that he was Lydia's father, out teaching her how to drive. Each of these facts lends credence to Lydia's claim that petitioner was attempting to force her to commit sodomy. The only fact which arguably casts doubt on Lydia's testimony is that Lydia initially told Officer Marzette that petitioner was her father. However, moments later, after she arranged her clothing and stepped out of the car, Lydia told the officer that petitioner had attempted to sodomize her and then told her to say that he was her father. We find that given the frightened state which Lydia was undoubtedly in, it is understandable that Lydia's instinctive reaction would be to lie to the officer until she could be sure that the officers could adequately protect her. Thus we do not believe that the inconsistent statement made by Lydia to Officer Marzette seriously harms her credibility.

Petitioner argues that the state failed to prove that Lydia was under eleven years of age. Petitioner is factually correct on this point since the only evidence on the record shows that Lydia was eleven years old at the time of the incident. However, the age of the victim (under eleven) is not an essential element of the crime of attempted sodomy in the first degree where the crime is committed by "forcible compulsion."[14] In this case there is no

doubt that a reasonable jury could have believed Lydia's testimony that petitioner used force both to get her into his car and to attempt to sodomize her once she was in the car. Therefore, there is no merit to petitioner's claim.

In sum we find that the instant petition must be dismissed in its entirety.

It Is So Ordered.

---

**14.** Section 130.50 of the New York Penal Law provides:

A person is guilty of sodomy in the first degree when he engages in deviate sexual intercourse with another person:

1. By forcible compulsion; or
2. Who is less than eleven years old; or
3. Who is incapable of consent by reason of being physically helpless.