UNITED STATES of America,
Plaintiff–Appellee,

v.

Jesus RAMIREZ–SANDOVAL,
Defendant–Appellant.

No. 87–5318.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 31, 1988.

Decided April 17, 1989.

Michael J. Brennan, Manhattan Beach, Cal., for defendant-appellant.

Janet C. Hudson, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before FLETCHER, ALARCON and HALL, Circuit Judges.

FLETCHER, Circuit Judge:

Defendant-appellant Jesus Ramirez–Sandoval entered a conditional guilty plea to the charge of transporting illegal aliens. He now appeals from the district court's partial denial of his motion to suppress evidence. The district court held that certain evidence was admissible under the inevitable discovery exception to the exclusionary rule. We reverse.

## I.

### FACTS

Sometime prior to July 22, 1987, Los Angeles Police Officer Juan Torres received reports from several merchants that they had, on a number of occasions, seen suspicious activity taking place near a red and white van parked in front of the Central Market at 317 South Broadway. Specifically, they had observed many people coming and going from the van and exchanging what appeared to be money. However, they did not report actually having seen contraband or weapons. These merchants told Torres that the van always appeared after 6:00 P.M., when Torres was off duty. They could describe the occupants of the van only as male Hispanics.

Torres was very familiar with his informants, and with the neighborhood in general, having been assigned to foot patrol duty in the area for five years. He was aware that there was considerable heroin dealing activity in the neighborhood, and he had seen dealers work out of parked vans on numerous occasions. Based on his experience and the information received, Torres concluded that the occupants of the van were probably engaging in illegal narcotics transactions. Torres also surmised that the occupants might be local dealers famil-

iar with his schedule, who delayed arrival until 6:00 P.M. when he was off duty.

Torres testified during the suppression hearing that on July 22, 1987 at 2:00 p.m., he was directed to a red and white van near the Central Market, occupied by two men in the front seat and others in the rear. As he approached the van, he could see that the occupants were Hispanic. He did not observe any illegal activity taking place in or around the van.

Torres and his partner ordered the two men sitting in front to get out of the van. Torres looked into the van, seeking evidence of narcotics. He noticed that the sun visor on the driver's side was hanging low; he touched it and several pieces of paper fell to the floor. He picked up one of the pieces of paper which had a list of names and numbers on it. He read one of the names out loud and a man in the back of the van responded. Torres asked the man what the number next to his name meant. The man responded that he and the others had recently crossed the border from Mexico and the number was the amount of money he had paid to be illegally transported into the United States.[1]

Torres and his partner then detained the occupants of the van and contacted the Immigration and Naturalization Service (INS). Torres testified that he did not further interrogate the occupants of the van. He also testified that he did not locate any narcotics or weapons during his search of the van.

Based upon information obtained from INS agents' questioning of the individuals found in the van, appellant Ramirez–Sandoval and codefendant Maravi–Hospinal were arrested and charged with offenses involving transporting and harboring illegal aliens. Appellant moved to suppress the evidence obtained as a result of Torres' actions, including the testimony obtained from interrogation of the aliens.

The district court ruled that Torres' detention of the occupants of the van was supported by a "reasonable articulable suspicion" that they were involved in illegal activity, and therefore was permissible. However, the district court ruled that when Officer Torres reached into the van, knocked papers from the sun visor, picked up those papers and read aloud from them, he performed an illegal search. The government did not appeal from that ruling. The court suppressed the physical evidence obtained from the illegal search, as well as the statements elicited by Torres from the illegal aliens at the time of the search. However, the court found that the aliens' testimony regarding identification of the defendants and arrangements they made for entering the country would be admissible at trial because the evidence would inevitably have been discovered. Appellant entered a conditional guilty plea, while preserving his right to appeal the issues raised in the motion to suppress. Appellant was sentenced to eight months in prison, and now appeals the district court's partial denial of his motion to suppress. This court has jurisdiction to hear the appeal under 28 U.S.C. § 1291.

## II.

## VALIDITY OF THE INVESTIGATORY STOP

Appellant's first challenge to the admissibility of the aliens' statements is that the initial detention of the individuals in the van was illegal. Specifically, appellant contends that Officer Torres' brief detention and questioning of the occupants of the van were not based upon a reasonable suspicion of illegal activity, and therefore were illegal. We disagree.[2]

---

1. Torres' conversation with the man took place in Spanish. Torres was born and raised in Mexico and is fluent in Spanish.

2. The district court's ruling on the legality of the detention of the van's occupants is reviewable de novo. *United States v. Thomas*, 844 F.2d 678, 680 n. 2 (9th Cir.1988); *United States v. Maybusher*, 735 F.2d 366, 371 n. 1 (9th Cir.1984), cert. denied, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985); *United States v. McConney*, 728 F.2d 1195, 1200–01 (9th Cir.) (en banc), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). *But see United States v. Magana*, 797 F.2d 777, 6779–80 (9th Cir.1986).

The parties do not dispute that Officer Torres' actions constitute a warrantless investigatory stop. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The question is whether the stop was legally permissible under the facts of this case. The Supreme Court articulated the level of cause necessary to justify an investigatory stop in *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981): "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." The Ninth Circuit has termed the requisite level of cause a "reasonable" or "founded" suspicion of criminal activity. *United States v. Greene*, 783 F.2d 1364, 1367 (9th Cir.), *cert. denied*, 476 U.S. 1185, 106 S.Ct. 2923, 91 L.Ed.2d 551 (1986). In evaluating the legality of the investigatory stop, the totality of the circumstances is taken into account. *Cortez*, 449 U.S. at 417, 101 S.Ct. at 694. The totality of circumstances "should include the modes of operation of certain kinds of lawbreakers, taking into account inferences and deductions that may be apparent to trained law enforcement officers." *United States v. Corral–Villavicencio*, 753 F.2d 785, 789 (9th Cir.1985).

■ A number of factors gave Torres a founded suspicion that individuals in a van fitting the description of the appellant's van may have been engaging in criminal activity. First, a number of reliable individuals had informed Torres that suspicious activity—specifically, numerous people going in and out of the van, and apparently exchanging money—had taken place in and around a red and white van on numerous occasions. Second, the van had been spotted in an area known to Torres to be popular for heroin dealing activity. Third, the van was observed only after 6:00 p.m., when Torres was off-duty, leading him to infer that the activity was timed so that it would be concealed from him. Fourth, Torres was aware that selling from parked vans was a common mode of operation for area dealers. Taken together, these factors provide a founded suspicion that the occupants of a van fitting the description of appellant's van may have been engaging in illegal activity.

Appellant attempts to minimize the importance of these factors by arguing that they do not provide reasonable suspicion to engage in an investigatory stop of *appellant's* particular van. Although appellant's van fit the description given to Torres, that description was not very specific (a red and white van occupied by two Hispanic males). In addition, appellant emphasizes that Torres did not himself observe any suspicious activity taking place in or around the van on July 22, 1987. However, Torres testified that the individual who directed him to the van on July 22 told him that it was the same van that had been reported to Torres previously. This provides an affirmative link between the earlier tips and the investigative stop of appellant's van. In light of all of these factors, we find that Officer Torres' investigatory stop was supported by a reasonable suspicion of criminal activity.

## III.

### ADMISSIBILITY OF THE EVIDENCE

Appellant argues that even if the initial stop was legal, the evidence against him, including the subsequent testimony of the aliens, must be excluded as fruit of the illegal search of the van. Because that evidence was derived from the illegal search, and because none of the exceptions to the exclusionary rule apply, we must agree.

The exclusionary rule, which bars the admission of evidence obtained in violation of the Constitution, extends beyond the direct products of government misconduct to evidence derived from the illegal conduct, or "fruit of the poisonous tree." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939). Verbal evidence, including live-witness testimony, may be no less the "fruit" of official illegality than is tangible, documentary evidence. *United States v. Ceccolini*, 435 U.S. 268, 275, 98 S.Ct. 1054, 1059, 55 L.Ed.2d 268 (1978); *Wong Sun v. United*

*States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).

However, the Supreme Court has developed three exceptions to the "fruit of the poisonous tree" doctrine which allow the admission of evidence derived from official misconduct. These three exceptions are the "independent source" exception, the "attenuated basis" exception, and the "inevitable discovery" exception.

The "independent source" exception operates to admit evidence that is actually found by legal means through sources unrelated to the illegal search. *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). Independent source evidence is not "fruit of the poisonous tree" because its discovery through independent legal means does not result from the official's illegal conduct.

The "attenuated basis" exception applies when the connection between the illegality and the challenged evidence has become sufficiently weak so as to dissipate the taint caused by the illegality. *Wong Sun,* 371 U.S. at 488, 83 S.Ct. at 417 (noting that the question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint"). This exception is applied more generously when the challenged derivative evidence is live-witness testimony than when it is documentary evidence. *Ceccolini,* 435 U.S. at 278, 98 S.Ct. at 1061.

■ The "inevitable discovery" exception, adopted by the Court in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), allows the introduction

of illegally obtained evidence if the government can show by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means. *Id.* at 444, 104 S.Ct. at 2509. This doctrine requires that "the fact or likelihood that makes the discovery inevitable arise from circumstances other than those disclosed by the illegal search itself." *United States v. Boatwright,* 822 F.2d 862, 864–65 (9th Cir.1987).

Although the three exceptions to the "fruits" doctrine developed separately, they are closely linked to one another. As the Fifth Circuit recently noted, the three exceptions converge to a certain extent, as in each case "[t]he core inquiry is whether the police would have discovered the evidence if the misconduct had not occurred." *United States v. Namer,* 835 F.2d 1084, 1087 (5th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988).

In this case, the government argued that the testimony of the aliens would be admissible under either the attenuation theory or the inevitable discovery exception.[3] The district court found that the testimony of the illegal aliens found in the back of the van was admissible under the inevitable discovery exception. Our analysis leads us to conclude that the evidence should not have been admitted on either of the bases advanced by the government.

**A. Attenuated Basis**

■ The Supreme Court set out the factors that we must consider in applying the attenuated basis exception to live-witness testimony in *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978).[4] These factors were derived

---

3. The government never attempted to argue admissibility under the independent source exception. That exception is inapplicable here because the testimony of the aliens was procured as a result of the illegal search, and not through independent means. We therefore focus upon the other two exceptions to the "fruits" doctrine.

4. In *Ceccolini,* a police officer visiting a friend, Lois Hennessy, at her place of employment discovered an envelope containing betting slips. Without informing Hennessy of the contents of

the envelope, he asked her to whom the envelope belonged, and was told that it belonged to her employer, Ceccolini.

Officer Biro passed this information along to the FBI, which had been investigating area gambling operations for some time. Ceccolini's business had been one of those under surveillance. Four months later, an FBI agent contacted Hennessy. Without referring to Biro's search, the agent asked Hennessy for information regarding the activities of Ceccolini. Stating that she would be willing to help, she spoke

from two basic themes outlined by the Court to guide judicial treatment of live-witness testimony under the attenuated basis exception. First, the Court argued that witnesses, unlike inanimate objects, often come forward of their own volition to testify, and that the illegality often will not have meaningfully affected that willingness to testify. Therefore, there is often a substantial likelihood that the witness would have been discovered by legal means, and in such circumstances, the link between the illegality and the testimony is weakened significantly.

Second, the Court was concerned that the costs of excluding live-witness testimony may be greater than the deterrent effect. It noted that exclusion would disable perpetually a willing witness from testifying about material facts, an enormous cost in light of the fact that police rarely conduct illegal searches in order to discover witnesses.[5]

In ruling that Hennessy's testimony was sufficiently attenuated to be admissible, the Court emphasized five factors: (1) "the testimony given by the witness was an act of her own free will in no way coerced or even induced by official authority as a result of Biro's discovery of the policy slips"; (2) the slips themselves were not used in questioning Hennessy; (3) substantial time elapsed between the time of the illegal act and the initial contact with the witness; (4) "both the identity of Hennessy and her relationship with [Ceccolini] were well known to those investigating the case" well before the illegal search took place; and (5) there was not "the slightest evidence" to suggest that Biro initiated the search "with the intent of finding a willing and knowledgeable witness to testify against" Ceccolini. Id. 435 U.S. at 279–80, 98 S.Ct. at 1061–62.

This case is unlike *Ceccolini*. First, the illegally obtained documentary evidence was clearly used by Officer Torres in questioning the witnesses. Second, no time elapsed between the illegal search and the initial questioning of the witnesses. Third, the identities of the witnesses were not known to those investigating the case. In all likelihood, the police and the INS would never have discovered these witnesses except for Torres' illegal search. Finally, although the testimony was voluntary in the sense that it was not coerced, it is not likely that these witnesses would have come forward of their own volition to inform officials that they were illegally transported into the country by the appellant. It seems clear that their testimony was induced by official authority as a result of the illegal search.

This case in its essentials is very much like *United States v. Rubalcava–Montoya*, 597 F.2d 140 (9th Cir.1978). In *Rubalcava–Montoya*, border patrol agents stopped a car which turned out to have five illegal aliens concealed in the trunk. The agents, without cause, searched the trunk and discovered the aliens. Rubalcava and two others were charged with transporting illegal aliens and conspiracy to transport illegal aliens. At trial, three of the aliens found in the trunk testified that Rubalcava had arranged for their illegal entry. Rubalcava was convicted, and appealed. This court reversed, ruling that the search was illegal, and that evidence given by the officers regarding discovery of the aliens, as well as the testimony of the witnesses found in the trunk, should have been suppressed.

---

with the agent, and ultimately testified before a grand jury, which indicted Ceccolini for perjury.

Hennessy testified at Ceccolini's trial, but after a finding of guilt, the trial court granted Ceccolini's motion to suppress her testimony, and set aside the verdict. The court of appeals affirmed, but the Supreme Court reversed, holding that Hennessy's testimony was admissible under the attenuated basis exception.

5. However, the deterrence analysis alone was not dispositive in *Ceccolini*. The Court explicitly rejected the government's suggestion that it adopt a per se rule allowing live-witness testimony regardless of the strength of the connection between the illegality and the testimony. 435 U.S. at 274–75, 98 S.Ct. at 1059–60. Thus, in applying *Ceccolini*, the lower courts must take care to examine the connection between the illegality and the testimony, because "[i]f applied in a loose and unthinking fashion, the result could be—in effect—the per se rule which the majority rejected." 4 W. LaFave, *Search and Seizure*, § 11.4(i) at 452 (2d ed. 1987).

We squarely rejected the government's contention that the testimony of the witnesses was sufficiently attenuated so as to be admissible. First, we noted that the testimony was apparently induced by the consequences of the illegal search.

Nothing in the record of the case before us indicates that in the time between the search and the trial the witnesses made an independent decision to come forward to testify to rehabilitate themselves or to assist the trier of fact in arriving at the truth of the case, or for any other reason. The illegal aliens who testified against appellants not only were discovered as a direct result of the illegal search, but were implicated thereby in illegal activity.

597 F.2d at 143.[6]

We also noted in *Rubalcava–Montoya* that *Ceccolini* was distinguishable because the identity of the witnesses and their relationship to the defendants were not known to the police, and would not have been discovered in the absence of the illegal search. *Id.* at 143–44 ("here there is no indication that the connection between the crime and the witnesses would have been discovered from a source independent of the illegal search") (citations omitted); *see also United States v. Scios*, 590 F.2d 956, 963 (D.C.Cir.1978) (en banc) (*Ceccolini* distinguished because the individual's "existence as a potential witness was entirely unknown to the authorities before they searched Scios's files").

The similarities between the present case and *Rubalcava–Montoya* are substantial. In both cases, the authorities discovered the illegal aliens as a direct result of an illegal search. Also, there is no evidence in either case that the aliens would have come forward of their own accord to testify against the defendants. On the contrary, they had every incentive not to do so because they had participated in the illegal activity. Although this court has refused to adopt a per se rule limiting *Ceccolini* to "good-citizen" witnesses who testify "out of a sense of civic duty," *United States v. Hooton*, 662 F.2d 628, 633 (9th Cir.1981), *cert. denied*, 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982), the potential witnesses' incentive to come forward independently is clearly relevant to the attenuation determination. *See Satchell v. Cardwell*, 653 F.2d 408, 409–10 n. 7 (9th Cir.1981) (unlike persons implicated in illegal activity, a brutally beaten multiple-rape victim would probably have come forward to testify even if she had not been discovered as the result of an illegal entry; her testimony was thus admissible under the attenuation exception), *cert. denied*, 454 U.S. 1154, 102 S.Ct. 1026, 71 L.Ed.2d 311 (1982). Finally, in neither case were the authorities aware of the existence of the witnesses and their relation to the defendants prior to the illegal search.[7]

---

**6.** This is consistent with the analysis in *United States v. Karathanos*, 531 F.2d 26 (2d Cir.), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976). In *Karathanos*, a search warrant was issued upon an inadequate showing of probable cause to search defendants' restaurant for illegal aliens. The defendants were indicted for harboring and concealing the aliens, after which the defendants moved to exclude evidence of the presence of those aliens, as well as their testimony. The motion was granted, and the court of appeals affirmed, rejecting the government's contention that the connection between the testimony and the search was broken by the aliens' decision to testify. The court reasoned, "[o]nce the aliens were arrested, the INS agents had obtained considerable leverage over them, since it was within the government's discretion to prosecute and deport them, or to allow them to leave the United States voluntarily." 531 F.2d at 35. Although there is no evidence in this case that officials explicitly exerted this sort of leverage over the witnesses, it is likely that a subtle pressure to cooperate was operating. Such testimony is unlikely to be the "act of ... free will in no way coerced or even induced by official authority ..." described in *Ceccolini*, 435 U.S. at 279, 98 S.Ct. at 1061.

**7.** The only possible basis for distinguishing *Rubalcava–Montoya* from the case before us is that in *Rubalcava–Montoya* the search itself was directed toward locating illegal aliens. Thus, although the search was not directed at locating witnesses as such, it is fair to say that the fifth *Ceccolini* factor was implicated to a somewhat greater extent in *Rubalcava–Montoya* than in this case. In our view, this distinction is insufficient to justify a different result in this case. Because each of the remaining factors in both cases favors suppression, distinguishing *Rubalcava–Montoya* on that basis would effectively create a rule making live-witness testimony admissible whenever the government can show

We conclude that in this case, as in *Rubalcava–Montoya,* the search and the testimony are too closely and inextricably linked to be admissible under the attenuated basis exception.

## B. *Inevitable Discovery*

The district court relied on the inevitable discovery exception recognized by the Supreme Court in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), to rule admissible the testimony of the aliens.[8] The Court ruled in *Nix* that evidence of the location and condition of the victim's body was admissible in the defendant's murder trial, despite the fact that the evidence was obtained through interrogation of the defendant in violation of his Sixth Amendment right to counsel. The Court reasoned that an ongoing search directed by the Iowa Bureau of Criminal Investigation would inevitably have discovered the body.[9]

■■■ Appellant argues that application of the inevitable discovery doctrine is inappropriate because in this case, unlike *Nix,* there was no independent investigation underway at the time Officer Torres obtained his information from the van's occupants. However, this circuit does not require that the evidence be obtained from a previously initiated, independent investigation. *Boatwright,* 822 F.2d at 864. The government can meet its burden by establishing that, by following routine procedures, the police would inevitably have uncovered the evidence. *United States v. Martinez–Gallegos,* 807 F.2d 868, 870 (9th Cir.1987); *United States v. Andrade,* 784 F.2d 1431, 1433 (9th Cir.1986).

In *Martinez–Gallegos,* the defendant challenged the trial court's refusal to suppress evidence showing he had reentered the United States after deportation in violation of 8 U.S.C. § 1326. Evidence relating to his prior deportation was obtained from his INS "A" file after INS agents obtained statements from the defendant in violation of his *Miranda* rights. The court held that the information in the "A" file would inevitably have been discovered even without the aid of the defendant's unwarned statements. 807 F.2d at 870. This conclusion was based on the testimony of the agents that, had the defendant refused to answer their questions, the agents' next step would have been to consult defendant's "A" file. *Id.*[10]

In *Andrade,* the defendant attempted to suppress the cocaine found in his garment bag during an allegedly illegal search after his arrest by DEA agents. The court did not determine whether the search was lawful, holding that the evidence would inevitably have been discovered through a routine inventory search of his belongings after arrest ("Andrade's transfer to the DEA's holding facility at Sea–Tac [airport] for processing was inevitable, as was the search of his belongings, including the garment bag. The routine booking procedure and inventory would have inevitably resulted in discovery of the cocaine."). 784 F.2d at 1433.

that the search was not initiated with the purpose of locating witnesses. This is the sort of loose interpretation that would effectively re-introduce the per se rule rejected by the *Ceccolini* majority.

8.  Whether our review of this mixed question of law and fact should be *de novo* or for clear error has not been decided in this circuit. Since reversal is mandated under either test, we do not decide that issue here.

9.  Agent Ruxlow of the Iowa Bureau of Criminal Investigation had organized and directed approximately 200 volunteers, who were divided into teams of four to six persons and assigned to particular sectors of a grid which Ruxlow had marked from highway maps. 467 U.S. at 448–49, 104 S.Ct. at 2511–12. The body was found

near a culvert, one of the types of places the volunteers had been instructed to search. The search parties were approaching the area in which the body was found before the police obtained its location from the defendant. There was testimony that it would have taken three to five hours to discover the body if the search had continued. *Id.* at 449, 104 S.Ct. at 2511. Thus, the Court found that the body would inevitably have been discovered, agreeing with three other courts that had reviewed the evidence. *Id.*

10.  The file was readily retrievable because Martinez–Gallegos was in the custody of county officials, and had given them his correct name during booking procedures. 807 F.2d at 870.

The government argues that routine questioning, legal in an investigative stop context, would have generated the same information obtained as a result of Torres' illegal search. Appellant does not challenge the contention that Officer Torres was *entitled* to ask the van's occupants who they were and what they were doing. *See, e.g., United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975). Appellant also does not challenge the government's assertion that had Torres done so, he probably would have received truthful answers from the smuggled aliens.[11]

The disputed issue is whether Officer Torres would in fact have questioned the van's occupants in the absence of his discovery of the piece of paper with the list of names. The government contends that Torres would "clearly" have asked basic investigative questions of the men in the back of the van, as this was the purpose of the investigative stop.

Appellant, on the other hand, points out that there is no suggestion in the record that Torres intended to question the aliens in the back of the van before he found the list of names and numbers. This view is supported by the fact that Torres did not initially question the two men ordered out of the front of the van, and the fact that he did not order the remaining men out of the van until after his search. Torres' declaration contains no suggestion that he intended to question the occupants of the van, and no evidence to that effect was introduced in the hearing.

Both the government and the district court merely assumed that Torres would have ordered the individuals out of the van, and questioned them in such a way as to elicit the relevant information. But it is equally plausible that the immigration status of the occupants of the van would not have been raised, especially in light of the fact that Torres suspected the van's occu-

pants of dealing narcotics, not harboring illegal aliens.

Thus, this case is not like *Andrade*, where the inventory search was an inevitable step in the imminent routine booking procedure, or *Martinez–Gallegos* where the *only* available procedural step (in the absence of the agents' illegal conduct) would have been to consult the defendant's "A" file. Torres had a great deal of discretion in choosing to ask or not ask certain questions. Based on the information presented to the district court, we cannot say with any certainty that the police would have discovered the evidence if the illegal search had not occurred. *Namer*, 835 F.2d at 1087. The government has failed to meet its burden of showing by a preponderance of the evidence that Officer Torres would have elicited the information had the illegal search not occurred. *Nix*, 467 U.S. at 444, 104 S.Ct. at 2509.

## IV.

## CONCLUSION

The testimony of the illegal aliens is a fruit of Officer Torres' illegal search of appellant's van. We find that this testimony is not admissible under any of the exceptions to the "fruits" doctrine, and that this evidence should therefore have been suppressed.

REVERSED.

---

**11.** During the suppression hearing, the government introduced the testimony of INS Special Agent George Walko indicating that, in most cases, illegal aliens will truthfully answer questions regarding their immigration status and how they entered the country. This testimony was introduced to suggest that had Torres engaged in permissible, routine questioning of the rear-seat occupants of the van, he would have obtained the same information obtained as a result of the illegal search.