**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jario A. MEJIA, Defendant–Appellant.**

**No. 94–50406.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 4, 1995.

Decided Oct. 26, 1995.

Callie A. Glanton, Deputy Federal Public
Defender, Los Angeles, California, for defen-
dant-appellant.

Erica Kelly Martin, Assistant United
States Attorney, Los Angeles, California, for
plaintiff-appellee.

Before: McKAY,* REINHARDT, and FERNANDEZ, Circuit Judges.

Opinion by Judge REINHARDT; Partial Concurrence and Partial Dissent by Judge FERNANDEZ.

## OPINION

REINHARDT, Circuit Judge:

Jario Mejia entered a conditional guilty plea to the charge of possessing counterfeit currency, after the district court denied his motions to suppress (1) statements he made while in custody and (2) counterfeit currency seized from his home. The principal issue on appeal is whether the district judge committed a reversible error in refusing to continue the suppression hearing for one court day to permit two key witnesses to testify before him in person. We conclude that the refusal to grant a continuance requires vacation of the denials of the motions to suppress. Thus, under Fed.R.Crim.P. 11(a)(2), we must remand to permit Mejia to withdraw his guilty plea if he elects to do so.

## I. BACKGROUND

After being arrested on an unrelated charge, Mejia admitted to possessing counterfeit currency and consented to a search of his home. During the search the currency was recovered. The issues at Mejia's suppression hearing were: (1) whether Mejia voluntarily consented to the search of his home; and (2) whether he received *Miranda* warnings before making incriminating statements to detectives. Resolution of each of these issues hinged on credibility—specifically, on whether Mejia's version of post-arrest events should be credited or that of the Los Angeles Police Department officers who interrogated him.

### A. *The Arrest*

The government and the defendant do not dispute the circumstances precipitating Mejia's arrest. Mejia negotiated the sale of a

substance he said was cocaine to a confidential informant and an undercover officer. After Mejia produced the substance, which was later determined to be plaster of paris mixed with a minute quantity of cocaine, several officers with their guns drawn arrested him.[1] Immediately following his arrest, he was transported to a Los Angeles police station and placed in an interview room.

### B. *The Interview*

Mejia and the government agree that Detectives Decesare and Barba of the Los Angeles Police Department interviewed Mejia at the police station. However, as sometimes happens, the account of the interview offered by the defendant differs sharply from that offered by the LAPD investigating officers.

#### 1. Mejia's Version

According to Mejia's version of what transpired at the police station, he was handcuffed to a chair throughout the interview. Soon after he was placed in the interview room, Detective Decesare entered and began asking him questions about the aborted drug sale in Spanish, the defendant's primary language. A few minutes later, Detective Barba appeared on the scene. The detectives then asked Mejia whether he had anything illegal in the house. Before he could answer, they told him that if he did not consent to a search of his home they would obtain a warrant, that they could do so in 20 to 30 minutes, and that they would bring charges against his wife if they found anything illegal in the house. Mejia stated that, because he did not want his wife to be charged with any crime, he felt that he had no alternative but to sign the consent form.

Mejia signed the form and told the detectives that he had counterfeit currency at the house. The detectives then stated that they would not bother to search his home since they were interested in drugs and not counterfeit monies. At that point, Mejia ripped

---

* The Honorable Monroe G. McKay, Senior Circuit Judge for the Tenth Circuit, sitting by designation.

1. Mejia was not charged with the attempted sale of a controlled substance, but only with the possession of counterfeit currency.

up the consent form.[2] The detectives continued to question him, pressuring him for information regarding his drug contacts. Decesare and Barba informed him that he was looking at 12 to 16 years in prison on the drug charges if he did not cooperate with the police; on the other hand, the detectives stated that, if he turned in two people, they would see that his sentence was reduced to one to two years. The detectives also told him that he should sign the consent form because it was not a good idea to have counterfeit currency in his home.

Afraid that the officers would obtain a search warrant and arrest his wife if he failed to cooperate—and that he faced a long prison term—Mejia signed a second consent form. After he signed this form, Mejia was informed by Detective Decesare that he would also have to sign a written statement to prove that he was cooperating with them. Decesare wrote the statement in English, verbally translating only the beginning into Spanish for Mejia. Decesare, Barba, and Mejia all signed the statement. No *Miranda* warning was ever given.

### 2. The Detectives' Version

Decesare and Barba provided a version of the facts markedly different from that of Mejia. According to Decesare, Mejia's handcuffs were removed when he was first placed in the interview room. Decesare informed Mejia that he faced narcotic charges for selling six kilograms of cocaine and that he faced a stiff fine. Decesare did not mention prison time to Mejia. Decesare told Mejia that "it made no difference to me whether or not he spoke to me." Mejia nevertheless expressed a willingness to speak, so long as the conversation was taped. Decesare responded that it would first be necessary to read him his *Miranda* rights. Before doing so, Decesare left the room to wait for Barba.

When Decesare returned to the room a few minutes later, accompanied by Barba, Mejia immediately stated his desire to confess. At this point, Decesare read Mejia his *Miranda* rights in Spanish and Mejia verbally waived those rights. Neither detective

made any reference to the length of prison time Mejia faced or promised him a reduced sentence if he cooperated—in fact, neither Decesare nor Barba knew the length of sentences for the amount of cocaine Mejia purported to sell. Barba explained to Mejia that the charging decision was for the prosecutors to make.

Mejia voluntarily confessed to making the plaster of paris mixture and to possessing counterfeit money at his house. The detectives asked him for permission to search his house, informing him that he did not have to consent, but that they would attempt to obtain a search warrant if he chose not to. Neither detective at any time threatened to arrest Mejia's wife if he declined to consent to a search.

Without further discussion, Mejia signed a form consenting to the search. This was the only consent form presented to Mejia or signed by him; no form was torn up. Decesare then wrote out a statement of cooperation, which Mejia and the detectives signed.

### C. *Post–Interview Events*

The parties do not dispute the events following the interrogation. Several officers, including Barba, escorted Mejia to his home. Upon arrival, Mejia told his wife, Denise, where the money was located. Barba and Mark McKee, a special agent of the United States Secret Service, followed her to retrieve the counterfeit currency and McKee took possession of it. The next day, Mejia wrote and signed a declaration in Spanish stating that he had counterfeit money, that he had told the police the previous day that the money was at his house, and that he was cooperating with both the police and the United States Secret Service.

### D. *The Suppression Hearing*

Mejia was indicted for possession of counterfeit money, in violation of 18 U.S.C. § 472, and the case was assigned to Judge Richard A. Gadbois, Jr. Mejia filed, along with supporting declarations, a motion to suppress the counterfeit currency and a motion to

---

**2.** He testified that only one hand was cuffed to the chair, and that he grabbed the form with the other, transferred it to the cuffed hand, and then, using both hands, tore it up.

suppress his statements to the detectives. The government opposed both motions, and filed supporting declarations from Decesare and Barba.

On May 9, 1994, Judge Gadbois heard testimony on the motions from Denise Mejia, Detective Decesare, and Detective Barba. The testimony consisted of both direct and cross-examination. The direct testimony was partly live and partly in the form of declarations. The hearing was then continued until May 25, 1994, so that the government could present the testimony of one additional witness, Special Agent McKee, and cross-examine Mejia.

During the intervening period Judge Gadbois became ill and the case was temporarily assigned to Judge Manuel Real. Judge Real conducted a hearing commencing on Thursday, May 26. He announced at the outset that the hearing would be conducted from scratch. The government stated that Decesare and Barba were on vacation for the Memorial Day weekend and were therefore unable to testify that day, but that both detectives would be available to testify on the following Tuesday (Monday being a legal holiday). The defendant then requested a continuance, so that he could obtain a transcript of the proceedings before Judge Gadbois for the purpose of impeaching the detectives. In response to the defendant's request, Judge Real stated: "No. We don't need a transcript on the motion to suppress. We can start over on the motion here. I am going to hear it today." When defense counsel tried to explain why she wanted the transcript, Judge Real disagreed, stating: "it boils down, basically, to believability.... One person says one thing about the arrest and what happened at the arrest, and the other side says something else, absolutely the other end of the spectrum. So it's only a question of believability." [3]

The hearing then began, as the earlier, aborted version had, with the testimony of Denise Mejia. When she finished, the gov-

ernment called Special Agent Mark McKee, to testify as to the events that transpired during the search of the defendant's home. After McKee left the stand, the government stated that it had no further witnesses to call at that time. Judge Real then informed the parties that it would not be necessary for him to hear live testimony from Detectives Decesare and Barba; instead, the court reporter would read him the transcript of Decesare's and Barba's earlier testimony the next afternoon. Surprised by Judge Real's announcement of his intention to substitute a transcript for the live testimony of the detectives, defense counsel objected, requesting "that the witnesses be called so that the Court could observe their demeanor in answering the questions." Judge Real overruled the objection. Mejia then took the stand and was examined by both counsel as well as by Judge Real.

The next day, Friday, May 27, Judge Real announced that he had read the reporter's transcript of Decesare's and Barba's testimony and defense counsel again objected to its use in place of live testimony. Counsel argued that the hearing should be continued to the following court day, Tuesday, May 31, so that the detectives could be examined in person in front of Judge Real. Again, Judge Real refused to grant a continuance, stating: "I don't need to do that.... There's no problem with [the detectives'] credibility.... The transcript will be made part of this proceedings [sic]." No further testimony was adduced.

After hearing arguments from both sides, Judge Real announced his decision to deny both Mejia's motion to suppress his statements and his motion to suppress the counterfeit currency. The judge requested the prosecutor to submit proposed findings of fact and conclusions of law, and then adopted them verbatim. In the written findings he adopted, Judge Real explicitly rejected the version of facts offered by Mejia. Alluding

---

3. This remark is puzzling. As Judge Real stated, the key question was believability; therefore, it would seem that a transcript of the prior proceedings would have been useful for impeachment purposes. However, whether the hearing should have been delayed in order to permit Mejia's counsel to obtain the transcript is another matter—a matter that is not in any way the basis for this appeal or otherwise before this court. In any event, because the officers did not testify a second time, the transcript issue is moot.

to the "demeanor of the witnesses as well as the content of their testimony," Judge Real concluded that Mejia and his wife had "hyperbolized the events" in question. On the other hand, Judge Real found the testimony of Barba and Decesare to be credible; specifically, he found that the transcript "did not reveal any inconsistencies, falsehoods or facts not already set forth in their declarations." Based on the officers' version of the events, Judge Real concluded that Mejia had voluntarily confessed after waiving his *Miranda* rights and similarly that he had voluntarily consented to the search of his home. Mejia subsequently filed a conditional plea of guilty, reserving his right to appeal the denials of the motions to suppress.

## II. DENIAL OF CONTINUANCE

■ Mejia contends that Judge Real abused his discretion in refusing to grant his request that the suppression hearing be continued for one court day, so that the government's two main witnesses could testify in person and be cross-examined in front of the judge who would be required to assess their credibility. We agree. As Judge Real recognized, the outcome of the suppression hearing turned on the credibility of the witnesses. We conclude that it was improper for the court to find the detectives' testimony credible without viewing their demeanor, especially in view of the fact that it relied on the "demeanor" of Mejia in determining that

his testimony was not credible. Because the denial of a one-day continuance resulted in the fact-finder's being required to decide factual issues without observing critical witnesses or hearing them testify in person, we conclude that sufficient prejudice exists to require reversal.

■ The district court's decision to grant or deny a request to continue a hearing is reviewed for an abuse of discretion. *United States v. Flynt*, 756 F.2d 1352, 1358 (9th Cir.1985), *amended*, 764 F.2d 675.[4] In determining whether a district court abused its discretion in denying a requested continuance, we analyze the following factors:

[1] the extent of appellant's diligence in his efforts to ready his defense prior to the date set for hearing.... [2] how likely it is that the need for a continuance could have been met if the continuance had been granted.... [3] the extent to which granting the continuance would have inconvenienced the court and the opposing party, including witnesses.... [4] the extent to which the appellant might have suffered harm as a result of the district court's denial.

*Id.* at 1359.[5] The weight accorded to each factor may vary from case to case; "[h]owever, in order to obtain a reversal, appellant must show at a minimum that he has suffered prejudice as a result of the denial of his

4. The government devotes much of its brief to arguing that the district court's findings of fact were not clearly erroneous. As the government correctly points out, the district court's finding as to whether consent to search was voluntary is reviewed for clear error. *United States v. Preciado–Robles*, 964 F.2d 882, 885 (9th Cir.1992). In this case, however, Mejia's primary contention is not that the district judge's findings were clearly erroneous, but rather that the district judge committed a critical error of law in conducting the hearing.

5. The government cites *United States v. Robinson* for the factors to be considered when determining whether the court abused its discretion in denying a continuance. 967 F.2d 287, 291 (9th Cir.1992). The factors listed in *Robinson* differ slightly from the *Flynt* factors. According to *Robinson*, the court should consider:

[1] whether the continuance would inconvenience witnesses, the court, counsel, or the parties; [2] whether other continuances have been granted; [3] whether legitimate reasons

exist for the delay; [4] whether the delay is the defendant's fault; and [5] whether a denial would prejudice the defendant.

967 F.2d at 291 (citing *United States v. Studley*, 783 F.2d 934 (9th Cir.1986)). In both *Studley* and *Robinson*, the defendant's right to counsel was implicated in the decision to deny a continuance. On the other hand, we have applied the *Flynt* factors in a variety of contexts. *See, e.g. Armant v. Marquez*, 772 F.2d 552, 557–58 (9th Cir.1985) (request for continuance to permit defendant representing himself to prepare for trial), *cert. denied*, 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 902 (1986); *United States v. 2.61 Acres of Land, More or Less*, 791 F.2d 666, 671–72 (9th Cir.1985) (request for continuance to allow bank whose property was seized to revive itself). We therefore apply the *Flynt* factors here. In any event, the factors in *Flynt* and *Robinson* are not very different, and the application of either set of factors would yield the same conclusion in this case.

request." *Id.* Here the factors all weigh in Mejia's favor.

## A. *Diligence*

The first factor we consider in reviewing the district court's refusal to grant a continuance is the appellant's diligence in preparing his case. *Flynt,* 756 F.2d at 1359. This factor clearly weighs in Mejia's favor. There is no indication from the record, and the government does not argue, that Mejia was less than diligent. The need for a continuance was not due to Mejia's lack of diligence, but rather to the fact that the government's two key witnesses were on vacation.

## B. *Usefulness*

█ The second factor is the likelihood that the continuance would serve a useful purpose. *Flynt,* 756 F.2d at 1360. A requested continuance would be useful if it would permit the appellant to introduce evidence relevant to the issue at hand. *Id.; see also United States v. Pope,* 841 F.2d 954, 957 (9th Cir.1988) (noting that *Flynt* required showing that "testimony would be relevant" and that "[n]othing more should be required" to demonstrate usefulness of continuance). Mejia argues that a continuance would have been useful, because it would have permitted Judge Real to perform a critical function necessary to a proper resolution of the suppression motion—to assess the detectives' demeanor while they testified. We agree.

There is no question that the alleged purpose of the continuance—allowing Judge Real to hear the testimony of the two detectives live—would have been satisfied if the continuance had been granted. The government, however, contends that there was no legitimate reason to continue the suppression hearing, since Decesare and Barba had already testified, and had been subject to cross-examination before Judge Gadbois. In these circumstances, the government argues, Judge Real was entitled to rely on Decesare's and Barba's declarations and the transcripts of their testimony. Thus, according to the government, further testimony would have served no useful purpose but would merely have prolonged the hearing.

We reject the government's contention that no useful purpose would have been served by granting the continuance. There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility. As the Supreme Court stated in *Anderson v. City of Bessemer,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985): "[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* at 575, 105 S.Ct. at 1512. Live testimony enables the finder of fact to see the witness's physical reactions to questions, to assess the witness's demeanor, and to hear the tone of the witness's voice—matters that cannot be gleaned from a written transcript. *See id.; United States v. Hood,* 493 F.2d 677, 680 (9th Cir.) (trial judge in unique position to observe witnesses demeanor while appellate court only has "the cold record, which is sterile in comparison"), *cert. denied,* 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 84 (1974). Because the district judge is able to hear testimony live and to view the witnesses as they testify, his credibility findings are entitled to deference on appeal. *See id.* By continuing the hearing for one court day, Judge Real would have had the opportunity to see and hear the government witnesses testify. Thus, the continuance would indisputably have served a useful purpose.

In support of its argument to the contrary, the government cites cases holding that it does not violate due process for a district judge to approve the factual findings of a magistrate judge without hearing testimony himself. *United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Campbell v. United States,* 501 F.2d 196 (9th Cir.), *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974). These cases do not support the government's position. In *Raddatz,* the Court approved a statutory scheme that permits the district judge to *accept* the magistrate's factual findings without himself hearing testimony. *Raddatz* thus stands for the proposition that the ultimate decision-maker, the district judge, need not hear live testimony, so long as the preliminary finder of fact, the magistrate judge, hears testimony *and* makes credibility findings based on his

observations, which the district judge then considers and accepts. Because the magistrate sees and hears live testimony, he has an adequate basis for making credibility determinations. Thus, no constitutional violation occurs. Here, Mejia was denied the opportunity to present live testimony before any person who acted as a fact-finder, preliminary or otherwise. Judge Gadbois, before whom the detectives did testify, does not qualify: He made no findings of any kind.

The circumstances that this case presents are thus materially different from those considered in *Raddatz*. Indeed, the *Raddatz* court expressly recognized the importance of live testimony before a trier of fact: "[W]e assume it is unlikely that a district judge would *reject* a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal; to do so without seeing or hearing the witnesses whose credibility is in question could well give rise to serious questions which we do not reach." *Id.* at 681 n. 7, 100 S.Ct. at 2415 n. 7.[6]

The district judge's actions in this case involve some of the same elements against which the Court warned. Judge Real made a conclusive evaluation of credibility on the basis of the written transcript without hearing live testimony from the witnesses whose credibility he was evaluating, and without the benefit of any credibility findings by the judicial officer who had presided over the taking of the witnesses' testimony. Given the importance of live testimony to credibility determinations—which the Court recognized not only in *Anderson* but also in *Raddatz*—we conclude that granting the continuance would clearly have served a useful purpose.[7]

### C. *Inconvenience*

■ The third factor is whether the continuance would inconvenience the parties, the court, or other witnesses. *Flynt,* 756 F.2d at 1360. This factor weighs heavily in Mejia's favor. Had the district court continued the proceedings for one court day, both Decesare and Barba could have presented their testimony. A delay of one court-day is ordinarily not a "cognizable inconvenience." *Flynt,* 756 F.2d at 1360 ("The hearing began at 1:30 p.m. and ended later that same day; recalendaring the proceedings would not have created any scheduling difficulties for the court"); *see also Armant v. Marquez,* 772 F.2d 552, 557 (9th Cir.1985) (recalendaring proceeding that lasted only one day would create minimal inconvenience). At any rate, neither the government nor the district judge indicated during the hearing that a one-day delay would result in any inconvenience whatsoever.

### D. *Prejudice*

■ The most critical question is whether Mejia was prejudiced by the district court's refusal to grant his request for a continuance. We may not reverse unless the party whose request was denied suffered prejudice. *United States v. Maybusher,* 735 F.2d 366, 369 (9th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). Given the importance of the testimony of the government witnesses who did not appear before Judge Real—and particularly the fact that the outcome turned on the credibility of those witnesses—we conclude that the district court's failure to hear their testimony directly and to view their demeanor was prejudicial.[8]

---

**6.** Our decision in *Campbell,* on which the government also relies, is similar to *Raddatz*. Both cases uphold, against a constitutional challenge, the statute authorizing magistrate-judges to conduct an evidentiary hearing and to make initial findings of fact.

**7.** We note that the district judge took an active role in cross-examining Mejia, when he thought that the prosecution did not pursue a point sufficiently. He did likewise with respect to Mejia's wife. We assume that Judge Real would have shown the same vigor in cross-examining the police officers, if their testimony was in any way

open to question. Although we do not rely on this point, live testimony might have been useful for this reason as well. It would have permitted the district judge to explore all the facts thoroughly and fairly.

**8.** Although the district court concluded that Mejia did not act in response to any threats to his wife when he signed the consent form, it appears that this finding is based not only on incomplete information (given the absence of live testimony and the attendant demeanor observations) but on a misapprehension as to the nature of Mejia's actual testimony. The district court appeared to

Where the denial of a continuance prevents the introduction of specific evidence, the prejudice inquiry focuses on the significance of that evidence. In *Flynt,* we held that the appellant was prejudiced by the district court's refusal to continue the hearing so that the appellant could obtain a psychiatric evaluation. 752 F.2d at 1361. Because the appellant's sole defense was his lack of the requisite mental capacity, we concluded that the importance of psychiatric expert testimony was "obvious." *Id.* The defendant was "not allowed to put forward the only defense he had." *Id.* at 1362. Similarly, in *United States v. Pope,* 841 F.2d 954, 958 (9th Cir. 1988), we held that the defendant was prejudiced, where the denial of a brief continuance prevented him from introducing "the only testimony that could plausibly have helped him." *See also United States v. 2.61 Acres of Land,* 791 F.2d 666, 671 (9th Cir.1985) (finding prejudice where denial of continuance prevented defendant from introducing any evidence on its behalf); *Armant v. Marquez,* 772 F.2d 552 (9th Cir.1985) (finding prejudice where denial of continuance effectively denied defendant the opportunity to prepare his own defense). Reversal is not required, however, where the complaining party is unable to explain how the denial of a continu-

ance affected his ability to present his case. *United States v. Lim,* 984 F.2d 331, 336 (9th Cir.1993), *cert. denied,* —— U.S. ——, 113 S.Ct. 2944, 124 L.Ed.2d 692 (1993); *United States v. Shirley,* 884 F.2d 1130, 1135 (9th Cir.1989); *United States v. Lane,* 765 F.2d 1376, 1379 (9th Cir.1985).

▮ Here, Mejia has provided a more than persuasive explanation of how the denial of the continuance adversely affected him. As Judge Real recognized, the outcome of both the motion to suppress Mejia's statements and the motion to suppress the counterfeit currency depended on the respective credibility of Mejia and the detectives. Mejia's only way to prevail was to convince the district judge that the officers' version of events was not truthful. Because the continuance was denied, the fact-finder was compelled to make his decision without hearing the live testimony of the critical witnesses and without having an opportunity to observe their demeanor.[9] Consequently, the defendant was deprived of the process to which he was entitled—a process designed to safeguard his interests and ensure a fair and proper result. Because the testimony of key witnesses was involved, the deprivation was substantial.[10]

believe that Mejia acknowledged that he did not sign the consent form in response to any threat regarding his wife. However, while Mejia testified that no threat was made at the time he signed the form, he also testified that at the beginning of the interview the officers threatened to arrest his wife if he refused to consent and if they then discovered contraband in his home. Moreover, even if the district court were correct, that fact could not affect the outcome of this appeal. We here consider a conditional guilty plea under Fed.R.Crim.P. 11(a)(2). If *any* ruling that forms a basis for the conditional plea is found to be erroneous, we are required to permit the defendant to withdraw his plea. Here, there were two motions to suppress. Only one is affected in any way by the finding regarding Mejia's state of mind concerning the threats to his wife. If as Mejia contends, the detectives failed to inform him of his *Miranda* rights, then suppression of his statements would be required, *United States v. Gonzalez–Sandoval,* 894 F.2d 1043, 1046–47 (9th Cir.1990), and he would be entitled to prevail in any event. Finally, given the fact that the motions were heard together, that they related to the same interrogation and involved overlapping issues, that the failure to give a *Miranda* warning can be a consideration when determining questions of consent, and that

the court's error as to both motions was identical, we would conclude that, under all the circumstances, a showing of prejudice as to either would be sufficient to require a finding of error and a new hearing as to both.

9. It is telling that the district judge thought demeanor evidence to be a crucial factor in evaluating Mejia's credibility. In explaining his reasons for rejecting the testimony of Mejia and his wife, Judge Real stated: "Based upon the demeanor of the witnesses as well as the content of their testimony, the Court finds that both the defendant and his wife hyperbolized the events underlying defendant's arrest and defendant's motion." Because Judge Real did not observe the testimony of the two key prosecution witnesses, he was obviously unable make a comparable assessment of their "demeanor."

10. Even the evaluation of Mejia's credibility could have been affected had the court had the opportunity to make a proper determination as to the veracity of the officers' testimony. While Mejia's demeanor may not have impressed Judge Real, the court's view of Mejia might have been far different had he observed the officers and reached the conclusion that they were being untruthful.

Under these circumstances, the prejudice requirement set forth in *Flynt* and other relevant cases is met.[11]

■■■ Our cases *require* the district court to conduct an evidentiary hearing when the moving papers filed in connection with a pretrial suppression motion show that there are contested issues of fact relating to the lawfulness of a search. *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir.1986). The purpose of requiring an evidentiary hearing, rather than permitting a decision to be based solely on written declarations, is to ensure that the district judge is presented with the information necessary to evaluate the truthfulness of the declarants. In this case, Judge Gadbois correctly concluded that an evidentiary hearing was necessary to resolve the disputed factual issues. Judge Real initially appeared to recognize that fact also. All that changed during the course of the hearing was that Judge Real concluded that he could end the proceedings one court day earlier if he read the transcript of the key witnesses' prior testimony instead of having them testify before him.

In arguing that Judge Real's decision was proper, the government likens this case to those in which a witness was unavailable and the court admitted transcripts of prior testimony under an exception to the hearsay rule. However, in *every* case cited by the government in which such transcripts were admitted because a witness was unavailable, the witness had either died prior to or during trial, *United States v. McGinnis*, 574 F.Supp. 661, 663 (N.D.Ill.1983), *aff'd*, 757 F.2d 1291 (7th Cir.1985) (table), *United States ex rel. Haywood v. Wolff*, 658 F.2d 455, 457 (7th Cir.), *cert. denied*, 454 U.S 1088, 102 S.Ct. 649, 70 L.Ed.2d 625 (1981), could not be located after a diligent search, *Ohio v. Roberts*, 448 U.S. 56, 75, 100 S.Ct. 2531, 2544, 65 L.Ed.2d 597 (1979), *Gonzalez v. Scully*, 578 F.Supp. 1063, 1069 (S.D.N.Y.), *aff'd*, 738 F.2d 418 (2nd Cir.) (table), *cert. denied*, 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 363 (1984), was incarcerated, *United States v. Salim*, 664 F.Supp. 682, 689 (E.D.N.Y.1987), *aff'd*, 855 F.2d 944 (2nd Cir.1988), or claimed the privilege of self-incrimination, *Phillips v. Wyrick*, 558 F.2d 489, 492 (8th Cir.1977), *cert. denied*, 434 U.S. 1088, 98 S.Ct. 1283, 55 L.Ed.2d 793 (1978).[12] Thus, the court could not reasonably obtain live testimony.

The reason for the exception permitting the use of transcripts in some instances is not because live testimony is unimportant, but because there are circumstances in which there is no practical alternative. Such is clearly not the case here. Decesare and Barba were on vacation and were available to testify on the next court day. Their unavailability for one day does not bring the case within the hearsay rule exception. In any event, the question here is not whether the transcript of the detectives' testimony was admissible, but whether the district court

---

11. We note that the standard we recently announced for determining prejudice in discovery cases is not applicable here. *See Martel v. County of Los Angeles*, 56 F.3d 993 (9th Cir.1995). As we recognized in *Sablan v. Dept. of Finance of N. Mariana Islands*, 856 F.2d 1317, 1321 (9th Cir. 1988) and *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir.1986), trial courts have unusually broad discretion to permit or deny discovery. Following this line of cases, *Martel* states that "a district court's decision to deny a continuance sought for the purposes of obtaining discovery will be disturbed only 'upon the clearest showing that the denial of discovery results in actual and substantial prejudice to the complaining litigant.'" *Martel*, 56 F.3d at 995 (quoting *Sablan*, 856 F.2d at 1321 and *Butcher's Union*, 788 F.2d at 540).

*Martel* requires an exceptionally high showing of prejudice because the right to take discovery preparatory to a judicial proceeding, unlike the right to present witnesses or offer other evidence at the judicial proceeding itself, is highly discretionary. For that reason, the *Martel* standard is not applicable outside the discovery context. Where, as here, the denial of a continuance of the proceeding directly affects a defendant's ability to present evidence, we do not require "the clearest showing" of "actual and substantial prejudice." To the contrary, we have consistently applied the less stringent prejudice test articulated in *Flynt*, and have examined carefully the extent to which the aggrieved party's right to present his defense has been affected.

12. In *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), also cited by the government, the admission of prior statements was held not to violate the Confrontation Clause, where the declarant testified at trial and was subject to cross-examination before the jury at the time his statements were admitted. In contrast to Barba and Decesare, the declarant in *Green* testified before the trier of fact.

abused its discretion in failing to grant a continuance so that the witnesses could testify live.

The fact that we make exceptions to the live testimony requirement when it is *necessary* to do so does not mean that transcript testimony is as desirable as live testimony, or that one or both of the parties do not suffer some prejudice as a result of its use. Rather, we admit the testimony because we conclude that in certain instances the prejudicial consequences of doing so are outweighed by the necessity of obtaining relevant information that is sufficiently reliable and that significantly advances the truth-finding process. However, we continue to recognize that whenever possible we must proceed by way of live testimony, so that the rights of the parties will be protected to the fullest extent practical. Were this not the case, we would simply permit the use of deposition testimony in all instances. In short, notwithstanding the hearsay exceptions, the inability of the fact-finder to observe witnesses whose credibility he must evaluate is, generally, contrary to our traditional fact-finding process and adversely affects the rights of the parties. When, as here, the inability to observe critical witnesses results from an erroneous judicial determination regarding the importance of live testimony, rather than from the application of established legal exceptions to the hearsay rule, we have no difficulty in concluding that the aggrieved party suffered substantial prejudice.

Because Judge Real did not view or hear the testimony of Decesare and Barba, he had no opportunity assess their demeanor and tone of voice. As he recognized, such evidence is critical to credibility determinations. Given the importance of the detectives' testimony—and of Mejia's attempt to impeach their testimony—we conclude that the district court's refusal to grant a one-day continuance so that the witness could appear and testify before the fact-finder prejudiced Mejia. In light of the above, the error requires reversal.

---

**13.** Of course, if the government could prevail on the continuance issue, it would not need to invoke the inevitable discovery rule. Accordingly,

## III. INEVITABLE DISCOVERY

 As an alternative basis for upholding the denial of Mejia's motion to suppress the counterfeit currency recovered from his home, the government contends that the evidence is admissible under the inevitable discovery exception to the exclusionary rule. We reject the contention that this doctrine applies where the police had probable cause to conduct a search but simply failed to obtain a warrant.

 The inevitable discovery exception allows the introduction of illegally obtained evidence where the government proves by a preponderance of the evidence "that the tainted evidence would inevitably have been discovered through lawful means." *United States v. Ramirez–Sandoval,* 872 F.2d 1392, 1396 (9th Cir.1989); *United States v. Echegoyen,* 799 F.2d 1271, 1280 n. 7 (9th Cir. 1986). The government contends that a failure to obtain a warrant should be excused, because Mejia's statements while in custody gave them probable cause to search his home. Thus, the government argues, a warrant would have issued if the detectives had sought one.

We first note that the factual premise of the government's argument is questionable—it is unclear whether there was competent evidence that would have supported an application for a warrant. Mejia, after all, has moved to suppress his statements to the detectives as well as the counterfeit money seized from his home. According to Mejia, his statements while in custody were made without the benefit of *Miranda* warnings. Thus, if the court had credited Mejia's testimony, it would have been compelled to suppress the statements he made while in custody. *See Gonzalez–Sandoval,* 894 F.2d 1043. Had Mejia's statements been suppressed, the government would have lacked probable cause to search his home and could not have obtained a warrant in any event. Thus, at best, the government's inevitable discovery argument is contingent on its prevailing on the continuance issue.[13]

the government's raising of this issue serves no purpose whatsoever.

Even, however, were we to assume that Mejia's post-arrest statements were admissible, and would have supported a warrant application, the inevitable discovery doctrine would not apply to the counterfeit currency recovered from Mejia's home. This court has never applied the inevitable discovery exception so as to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant. As we stated in *Echegoyen,* to "excuse the failure to obtain a warrant merely because the officers had probable cause and could have obtained a warrant would completely obviate the warrant requirement." 799 F.2d at 1280 n. 7; *see also United States v. Johnson,* 22 F.3d 674, 683 (6th Cir.1994) ("to hold that simply because the police could have obtained a warrant, it was therefore inevitable that they would have done so would mean that there is inevitable discovery and no warrant requirement whenever there is probable cause"). If evidence were admitted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be *any* reason for officers to seek a warrant. To apply the inevitable discovery doctrine whenever the police could have obtained a warrant but chose not to would in effect eliminate the warrant requirement.

We are neither free nor willing to read the warrant requirement out of the Constitution. Accordingly, even if we assume that the detectives were in possession of competent evidence showing probable cause at the time of the search, the inevitable discovery doctrine would not justify introduction of the evidence seized without a warrant.

## IV. CONCLUSION

Judge Real abused his discretion in refusing to grant a continuance of one court day to allow the government's key witnesses to testify live before him. Given the importance of those witnesses' testimony and the need to assess their credibility, we conclude that Mejia has made the showing of prejudice that the *Flynt* test requires. Accordingly, the denial of Mejia's suppression motions must be vacated and he must be permitted, if he so elects, to withdraw his Rule 11(a)(2) plea of guilty.

REVERSED and REMANDED.

FERNANDEZ, Circuit Judge, concurring and dissenting:

I dissent from Part II of the majority opinion but concur in Part III.

Mejia's argument proceeds from the premise that an ideal procedure would have been for Judge Real to grant a continuance and hear live testimony from the officers. No doubt that would have been ideal, and I am somewhat at a loss to understand why the ideal did not become the reality. Nevertheless, I do not agree that reversal is required.

Mejia's argument comes parlously close to suggesting that district courts simply cannot make proper decisions in suppression cases without seeing the witnesses. That, of course, is not true. *See United States v. Raddatz,* 447 U.S. 667, 677–81, 100 S.Ct. 2406, 2413–15, 65 L.Ed.2d 424 (1980); *Campbell v. United States District Court,* 501 F.2d 196 (9th Cir.), *cert. denied,* 419 U.S. 879, 95 S.Ct. 143, 42 L.Ed.2d 119 (1974). I do not overlook the Supreme Court's footnote 7 in *Raddatz,* 447 U.S. at 681, 100 S.Ct. at 2415. However, I do not think that one should put very much weight on the dicta in that footnote. The agency proceedings alluded to by the Court do not, as far as I know, preclude the boards, which are making the ultimate decisions, from making credibility determinations different from those of the hearing officers. Indeed, we know that agency boards do just that. *See, e.g., Cardoza-Fonseca v. INS,* 767 F.2d 1448, 1455 (9th Cir.1985), *aff'd,* 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *McMullen v. INS,* 658 F.2d 1312 (9th Cir.1981). Moreover, the idea that a district court must actually review a magistrate judge's determinations *de novo,* but may not upset the magistrate judge's credibility decisions is troublesome to say the least. Much of what passes as factfinding in our system does in fact require resolving conflicts in the evidence and therefore believing one party or the other. If a district judge could not read a hearing transcript and come to a conclusion that differs from that of

the magistrate judge, the utility of magistrate judges in our system would be greatly undermined. That cannot be: mutatis mutandis a district judge should generally be able to read a hearing transcript and make his own assessment in the first place.

That being said, I do not think that Mejia should carry the day. It seems to me that he has utterly failed to show that he was prejudiced. True, he keeps uttering the generality that the district court could have made a much more just decision had it only seen the officers in person. But Judge Real had the officers' declarations before him and had the transcript of their cross-examination in front of Judge Gadbois. As Judge Real pointed out, that cross-examination did not appear to develop any relevant inconsistencies or to bring out any even remotely interesting contradictory testimony. There was no particular reason to think that a second cross-examination would have been more efficacious.

Also, if the officers did exhibit any unusual body language, facial expressions, vocal hesitations, or the like on the first cross-examination, we may assume that Mejia would have been quick to tell Judge Real about those incidents. Demeanor problems would surely underscore the need for seeing the officers in person. Again, Mejia contented himself with generalities.

Finally, when the fact that the district court found Mejia and his wife to be unbelievable is added to the mix, the whole becomes less, not more, redolent of prejudice. In short, while I do not entirely fathom the district court's reluctance to hear the officers' testimony on a later day, I also do not think that Mejia has adequately explained how he was actually prejudiced. *See United States v. Robertson,* 15 F.3d 862, 873 (9th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 362, 130 L.Ed.2d 315 (1994).

Thus, I respectfully dissent from Part II of the opinion.